

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-10-00202-CV

---

IN THE INTEREST OF C.F., K.F.,
K.F., J.F.K. AND J.F., CHILDREN

----------

FROM THE 271ST DISTRICT COURT OF WISE COUNTY

----------

## MEMORANDUM OPINION[1]

----------

This is a father's appeal from a judgment terminating his parental rights to his five children.[2] Father challenges the trial court's finding that he knowingly placed or allowed the children to remain in conditions or surroundings that endangered their well-being. He also claims that reunification, rather than termination, is in the children's best interest. We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

[2]Mother signed an affidavit of relinquishment and has not appealed the order terminating her rights to all five children.

# I. Sufficiency Standard of Review[3]

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001 (West Supp. 2010), 161.206(a) (West 2008). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the trial court's judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated subsection (D) of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001(1)(D); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth

---

[3]Because Father challenges the factual sufficiency of the evidence, we will review the background facts in the analysis of that issue.

of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## II. Endangerment

## A. Applicable Law

Endanger means to expose to loss or injury or to jeopardize. *Tex. Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex. 1987); *In re J.T.G.,* 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re M.C.,* 917 S.W.2d 268, 269 (Tex. 1996). To prove endangerment under subsection (D) of section 161.001(1), the Department of Family and Protective Services had to prove that Father (1) knowingly (2) placed or allowed the children to remain (3) in conditions or surroundings that endangered their physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D); *In re Z.C.,* 280 S.W.3d 470, 474 (Tex. App.—Fort Worth 2009, pet. denied). "Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being." *In re M.C.T.,* 250 S.W.3d 161, 168 (Tex. App.—Fort Worth 2008, no pet.). But to support a finding of endangerment, "the parent's conduct does not necessarily have to be directed at the child nor is the child required to suffer injury." *Id.* at 169. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd,* 727 S.W.2d at 533; *In re R.W.,* 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. *R.W.,* 129

3

S.W.3d at 739. Drug use and its effect on a parent's life and his or her ability to parent may also establish an endangering course of conduct. *Id.; see Z.C.,* 280 S.W.3d at 474 (stating that a parent's "drug use and drug-related criminal activity may support a finding that the child's surroundings endanger his [or her] physical or emotional well-being"). Further, a parent's mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct that jeopardizes the physical or emotional well-being of the child. *R.W.,* 129 S.W.3d at 739. To determine whether termination is necessary, courts may look to parental conduct both before and after the child's birth. *In re D.M.,* 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.); *see In re M.R.J.M.,* 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g) (explaining that the "factfinder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent").

## B. Applicable Facts

### 1. CPS

Cindy Martin, a family worker with the Department of Family and Protective Services, testified that she became familiar with Father's family in April 2008, after a transfer from Montague County. CPS had been previously involved in Montague County because of domestic violence. Martin could not find the family to provide services until the end of May 2008 and thus was unable to provide them with services. The first address she had was vacant. Martin found a second address, but although she spoke with the family on the phone, made appointments, and even met Father at her office once, every time Martin showed

4

up at the second address, the family was not there. Martin had to contact relatives and eventually found the family living in a tent in the LBJ Grasslands.[4]

Martin brought the family supplies, food, clothing, and shoes for the children, who had none. The children told Martin that they had left their prior house in such a hurry that they did not take shoes with them. Father and Mother told Martin they left their home because there had been an electrical fire the day of Martin's scheduled home visit; however, when Martin had arrived the day of that visit, the landlord told her the family had just left suddenly. The family had left their possessions behind in the home, and it had not burned down.

Martin tried to initiate the same service plan that Mother and Father were supposed to have been working in Montague County. Martin was not able to initiate the services at that time because the family was not sure how long they would be living there. But Father and Mother "verbalized that they would be willing to work something." The issues Martin wanted to work on were getting Father and Mother stable and safe housing, stable employment, and help with drug abuse and possible mental health issues. Martin did not specify what the drug abuse issues were other than to say that those issues were in the family's file history.

When Martin found the family, they were about to be evicted from the Grasslands because they had stayed too long and were not able to pay the Park Service fee. The tent was a tight fit, but the family told Martin that some were sleeping outside or in the car because it was warm. She met with them one more time in the Grasslands; she did not have any more contact with them after

---

[4]These are public lands managed by the United States Forest Service.

5

the end of July because they had moved again. She finally tracked them to the Sunset Inn in Wise County through a relative. Father agreed to sign a family group contract to start services with CPS, but he called back a few days later and said he did not want to do so anymore because he did not think he could get any family support. Martin still wished to offer services, so she set up an appointment at the Sunset Inn for late July; the family was not there because they had gone to the lake.

The Department closed the case at that time because it appeared that the children's basic needs were being met by relatives even though Father and Mother would not take advantage of offered services. Martin never drug tested Father or Mother.

Regina Milner, a specialist and investigator with CPS, testified that the family was assigned to her in October 2008 because Father and Mother were arrested for stealing from Walmart; the children had participated. Milner met with Father, Mother, and two of the daughters on October 15 at the Sunset Inn. At that time, Caren and Karmen, the two oldest, had been placed with an aunt; Janice, the youngest, had been placed with another aunt; and Joan and Karla had been placed with Father's father.[5]

Milner got a "frantic" phone call from one of the aunts saying CPS needed to come pick up Caren and Karmen. She was tired of "constant harassment" from Mother and Father about what she was and was not doing with the children. When asked if CPS could work with her or if another family member would take

---

[5]All of the girls are referred to by pseudonyms in this memorandum opinion. *See* Tex. R. App. P. 9.8(b).

6

the children, she said no and that "no one with the family wanted anything to do with" Father. Nobody was willing to take the children at that time. A CPS investigator approved Caren's and Karmen's going back to Mother and Father if Mother and Father passed an oral swab drug test; they did, so Caren and Karmen were taken back to Father and Mother at the Sunset Inn.

On the way back to the motel, Karmen was "very, very withdrawn and quiet," and Caren "was crying hysterically." She said, "Please keep me. Please do not take me back to my parents." The girls said they were hungry, so Milner took the girls to McDonalds and then to her office in Decatur. The girls told her why they did not want to go back to their parents. They said that there was no food a lot of times, their parents locked them in their room all day when they were crashing from drugs, they had been slapped on the side of the head, the tent was scary and it flooded, Mother's behavior was irrational, and Father was very aggressive. Sometimes Father and Mother would call Caren "a fucking idiot" because she has ADHD. Both girls said Father and Mother "habitually" used prescription medicines, such as hydrocodone; Mother introduced Caren to marijuana on one of Caren's birthdays, but Father did not know. The girls also said that Father and Mother had "crazy, scar[]y, fights." They would hit each other in front of the girls. The girls said Father and Mother would drink and then crash, leaving the girls unattended; Caren felt as if she had to parent the younger ones in those instances. According to Milner, the children were underweight for their ages.

The girls worked on a safety plan with Milner that would allow them to feel safe in the home. It included no physical discipline of the children, no fighting between Father and Mother, that Father and Mother would give the children the

7

medicine their doctor had prescribed for them,[6] that they would have appropriate food in the house at all times, that Father and Mother would refrain from calling each other and the children names and from yelling, that Father and Mother would not drink alcohol, and that Father and Mother would not discuss family problems or the CPS case with Caren and Karmen except in counseling.

Milner presented the safety plan to the parents at the motel; although they agreed to the plan, Father did not sign it and was very hesitant. However, neither parent denied those things had happened in their home. Caren and Karmen signed the plan.

Milner then developed a service plan and went over it with Father and Mother on October 27. One of the services was to help Father and Mother get their GEDs; CPS was going to pay for them. When Milner left the case, Father and Mother had called the agency but had not completed the program. Father and Mother told Milner they had had cases with CPS in the past but that they were excited this time because Milner's plan appeared to be doable for their family. Milner also referred Father to DARS[7] because of his back problem, but she was not aware that he followed through with that. Another part of the plan was for the family to obtain financial independence and to go to individual, couples, and family counseling. Father and Mother had not followed through on

---

[6]Father and Mother would not give Caren her ADHD medication even though she did better in school with it.

[7]According to Father, DARS is a rehabilitation and job training program. He did not go because it was in Fort Worth and he did not have transportation; he also admitted that he had gotten literature on the program before, and he thought it would not work.

the counseling while Milner was assigned to their case. Mother told Milner once that she knew what was wrong with her and how to fix it.

CPS asked the family to refrain from physical discipline, refrain from alcohol and drug use, take anger management classes, have psychological assessments, and meet with Milner once a week to discuss how to parent an ADHD child. To Milner's knowledge, Father and Mother did not complete any of the services. Milner asked them to do an evaluation for substance abuse, which they did not complete. Father and Mother tested negative for drugs whenever Milner tested them.

Milner had, during the course of her assignment to the case, driven Father and Mother to the food bank and transported them to a meeting for Caren's school special education program. She would also stop by if they needed anything. Mother and Father were familiar with community resources, and Mother was already registered with two food banks. Although the GED program was in Arlington, Milner had told both Mother and Father to call her and she would get them anywhere they needed to go.

Milner was the worker who removed the children. She had already warned Mother and Father not to alienate the family members with whom the children had already been placed. Around this time, she received a phone call from Mother and Father that they were being asked to leave the motel, that they would be staying in a tent in the Grasslands again, and that they felt it was unsafe for the girls to accompany them. Mother and Father asked Milner to come pick up the girls. Milner talked to Father's father, who reluctantly agreed to take the older girls for the weekend. Janice was also at her grandfather's when Milner arrived with Caren and Karmen, which was in violation of the safety plan. Milner was

9

told that the aunt with whom Janice had been placed dropped her off to visit her grandfather and never picked her back up because she had a work conflict and could not care for Janice anymore. Mother and Father were not happy with the girls being placed with their grandfather, but they had no other alternative. The other relatives were adamant about not taking the girls because of the "violent calls" from Mother and Father. Milner sensed that the calls were not because of abuse concerns but were because of Mother and Father "wanting to be in control of their [kids'] lives." At the time, Milner had Father and Mother sign a safety plan.

When Milner dropped off Caren and Karmen at their grandfather's house, she explained to them the difference between normal discipline and conflict. However, the house was crowded because it was a two bedroom duplex. Milner and her staff handled several phone calls from the grandfather over the weekend; he could be heard calling the girls names and screaming. Milner pointed out that he said he would not do that, but he said the girls would not listen to him. Caren and Karmen had taken on the role of caregivers to the younger girls and were questioning what their grandfather was telling them. There was a lot of conflict.

That next Monday, Milner went back to the Grasslands to try to find Father and Mother; but she could not find them. She then went to the motel to serve the removal papers, and Father and Mother were there. Mother acted very emotional and then slammed the door; Milner and Father talked about the fact that no other relative would take the children, but Father never asked for the children back. Milner took the children into CPS custody that day; CPS then transferred the case to caseworker Laura Patterson.

10

Laura Patterson was assigned to the case in December 2008. Patterson felt she had a "pretty good" relationship with the girls even though at first they were guarded and did not open up much.

According to Patterson, Caren and Karmen were "pretty verbal" with her about Mother and Father's fights. These fights happened frequently.[8] They said furniture was broken, and the police would have to come out and separate the parents. Caren felt that she had to protect and be the caretaker of her siblings. Caren and Karmen expressed fear of living in the home. Caren had used drugs with Mother and had also found paraphernalia under her parents' bed. Karmen said she had seen both her parents use drugs.

Caren talked about stealing chicken from Walmart and about pumping gas and not paying for it when she was with her parents. Both Caren and Karmen had talked about an incident during which the family's car was being repossessed, and Father asked Caren to sit on top of it so that it could not be towed away.

According to Patterson, the children did not ask to go with Father after their visits, nor did they ask when they were going to see their parents again. Patterson said this behavior was unusual; the majority of the children on her caseload would cry at the end of visits and would call her regularly wanting to know when their next visits would be.

Father passed every drug test that he showed up for but one; for the one he did not pass, he provided paperwork from the emergency room showing that

_____

[8]Father admitted that domestic violence was "an issue in [the] home at that time."

11

he had been there the night before with kidney stones. She had never seen Father appear to be under the influence of drugs.

After the girls' last visit with Father in April 2010 (they had not seen him since January), the foster parents reported that Caren's behaviors had gotten worse, Karmen had shown more anxiety than she had previously, and Janice "had increased in some particular behaviors."

## 2. Counselors

Dr. Roger Doss, a licensed professional counselor, testified that he had been providing counseling for the four youngest children for almost a year; they had been in three different foster homes during that time. According to Dr. Doss, Janice, who was six years old at the time of trial, was experiencing a lot of anxiety, bedwetting, and defiant behavior. The next oldest, Joan, who was nine years old at the time of trial, was having issues with defiance and lying. Karla, ten years old at the time of trial, was having issues with anxiety and stress when Dr. Doss first started seeing the children. And Karmen, thirteen at the time of trial, "was having a lot more defiant issues, not being very compliant." His initial impression of these four children was that they were "kind of disconnected, real anxious." Behaviors they exhibited were "screaming, lying, being defiant, [and] not following guidelines." They had issues with acting out in school as well as academic challenges." The girls also had some social and developmental issues that Dr. Doss attributed mostly to the anxiety, but they did "interact with each other fairly well."

Dr. Doss testified that Karmen had problems with aggressiveness and anger, that she was "not very forthcoming with what's going on emotionally," and that she liked to engage in power struggles. She had hit her first foster father.

Foster parents had reported that she sometimes was aggressive with her sisters when she did not get what she wanted.  Karmen would not talk much about life with Father except to be dismissive or say, "it wasn't that bad."  She would not talk about whether Father used drugs and when questioned about Father and Mother's fighting, she would say, "Oh, they just got mad and my mother left." Karmen did admit that the family did not have much food and would have to sometimes fish for food, but she would not elaborate.  Karmen was "very mistrustful [and] very guarded" in her play and interaction with Dr. Doss.

Dr. Doss said that Karla was "very anxious" and struggled more in school than Karmen.  She tended to worry a lot.  She was not as aggressive and tended to play the victim role; she was always trying to make things better.  Karla talked about her parents fighting and something being thrown; she was scared and anxious when her parents fought.  She talked about her family living in a tent and how she wanted her own house someday; Dr. Doss believed those kinds of statements showed Karla felt unsettled in her living conditions with her parents. She told Dr. Doss that she liked living in the tent sometimes, except when it was cold or rainy.  She would not talk about whether her parents used drugs, but she did acknowledge that the family did not have much food.  Dr. Doss thought that Karla was a grade behind in school.  In her play and interaction with Dr. Doss, Karla seemed to be "wanting to feel settled."

Dr. Doss reported that Joan had had "major issues with . . . lying" and schoolwork.  She "look[ed] to avoid any uncomfortable emotions" and engaged in avoidance of conflict.  Joan told Dr. Doss that Mother and Father fought, "that they would sometimes throw things," and that one time "someone from the church came."  Joan confirmed to Dr. Doss that the family sometimes did not

13

have enough food and had to eat beans or catch fish to eat. Joan was very influenced by Karmen and would sometimes join in Karmen's aggressive behavior. When asked about being adopted into a "forever home," Joan responded that she hoped the family had a dog and would talk about some of the things she wanted in such a home. Joan liked to be in a position of feeling powerful and in charge in her play.

Janice "tend[ed] to have more things going on in her head" and was very imaginative. She tended to live more in a fantasy world. Janice acknowledged that her parents fought, but she would not elaborate. Her foster parents reported to Dr. Doss that Janice had quit wetting the bed but would still occasionally have screaming fits when she did not get her way.

Dr. Rhonda Polakoff assessed the oldest child, Caren, in January 2010 when Caren was fifteen.[9] As part of the assessment, she interviewed both Caren and Caren's foster parents. Caren's foster mother was very concerned with Caren's "level of detachment"; Caren engaged in destructive behaviors, but Caren did not seem very concerned about those behaviors. The foster mother was Caren's fifth, and she said that although Caren was cooperative and pleasant, she was very detached and aloof and "there was very little communication." Caren had academic delays and did not participate much in school activities.

When Dr. Polakoff interviewed Caren, she was distant, "very detached," and depressed. Caren was very formal and robot-like. Caren reported "a long history of substantial abuse and violence in the home and oftentimes not having

_____

[9]Caren was still fifteen at the time of trial.

14

a car, not having enough food to eat, [and] having to steal to survive." Caren said times were happier in the past and that when she and Karmen were little, they were locked in a room all the time, but they had toys and food. Caren did not know such a thing was wrong until she was ten. Dr. Polakoff described Caren as being so traumatized that she had no awareness of how traumatized she had been. Caren had been to the psychiatric hospital twice since being in foster care.

Caren reported to Dr. Polakoff that Father had "tried to drown her mother in the pool." Sometimes she tried to defend Mother, but Father "would subsequently punch her in the face." She also said that Father "pushed [Mother] out of a car going 80, and it was scary. [The children] thought she died, but . . . she came home all scratched up." Dr. Polakoff said she had no idea if what Caren said was true or not, but "she was reporting [these incidents] as if they were her . . . realities." Dr. Polakoff said that Caren's functioning had definitely been impacted by the violence between her parents.

Caren also told Dr. Polakoff that the girls missed a lot of school because they never had clean clothes to wear. Caren did not show any emotion about having to miss school, however. Dr. Polakoff tested Caren's IQ, which was 74; she also tested her academic skills, which were "very, very weak." Psychological testing showed that Caren "struggled with significant insecurities, troubles with self-esteem, . . . difficulties with being able to trust[,] . . significant emotional behavioral issues, . . . significant depression[,] and self-destructive behavior." Her person drawing showed problems with trust and attachment.

Dr. Polakoff gave Caren's foster mother a questionnaire in which she indicated that Caren had severe symptoms of depression and that Caren also

displayed disruptive behavior disorders, such as experimenting with drugs and sexual promiscuity, and breaking the rules at school.[10] Dr. Polakoff diagnosed Caren with "[s]evere reoccurring depression, post-traumatic stress disorder, disruptive behavior disorder, borderline intellectual functioning, and borderline independent personal traits." The "borderline independent personal traits" are "characterological problems," i.e., low self-esteem, poor social judgment, poor impulse, and not being able to modulate her emotions. According to Dr. Polakoff, these traits occur when a person experiences trauma early and his or her personality and character does not adequately develop. For example, the foster mother had reported that when Caren was in a cast, she cut it off so that she could run away. Dr. Polakoff stated that if Caren were engaging in cutting behavior, it would be a sign of her poorly-developed behavior and inability to cope with "evil feelings."

Dr. Polakoff admitted on cross-examination that some of Caren's personality traits, in particular the depression, could be genetic. She also agreed that the instability of Caren's foster-care situation could have impacted Caren's functioning. She agreed that Caren was probably a difficult child to care for and that someone would have to be very committed to her care. She thought waiting six months to a year before deciding on a permanent placement for Caren would create a lot of anxiety for her. Dr. Polakoff recommended that every effort should be made to place Caren in a foster home with psychiatric intervention and counseling, but she feared Caren would end up in a residential treatment center

---

[10]Caren reported experimenting with marijuana, alcohol, depressants, and amphetamines between the ages of ten to fourteen when she was still living with her parents.

"because her functioning [was] so impaired that she [could not] be treated on an outpatient basis."

Dr. Polakoff stated that, unlike Caren's depression, the PTSD and disruptive behavior were not genetic. According to Dr. Polakoff, the personality issues were from problems with early childhood, not just from being in the foster care system. Although she could not confirm with accuracy whether what Caren said about her childhood had actually happened, Dr. Polakoff did testify that the foster mother said the same thing and that Caren's functioning was "so severely impaired that it would suggest that there has been a long history of trauma."

She admitted that Caren's problems could also be related to having a fire in the home, being homeless, and having parents without jobs, and that she could be engaging in self-destructive behavior for attention. But Dr. Polakoff said Caren's behavior was worse than a normal teenager and very extreme.

Marti Riedel, with CPS therapy services, testified that she provided therapy to Caren. Caren had been placed in a foster home where she was separated from her siblings. Riedel was provided with a diagnosis of attention deficit disorder, which is the initial diagnosis she used in treating Caren. She would speak with Caren's caregivers at every session. Caren was very responsive to Riedel.

According to Riedel, Caren "is a fairly bright child. She's academically delayed. She has a very low self-esteem. She has very poor problem-solving and decision-making skills. She has the capacity for great improvement, but doesn't have the motivation at this time to achieve that." Caren would accept consequences for her behavior but would minimize her culpability for it. Caren was "very, very savvy with her peers" but functioning on a fourth or fifth grade

17

level academically. She had been expelled from school twice and was in danger of being sent to an alternative school if she were expelled again; the foster parents could not take her to the alternative school, so Caren would have to move again.

Caren told Riedel that her parents used drugs, were in trouble with the law because of their drug use, and that Caren used drugs when she was with her parents. She also told Riedel that her parents were not around a lot; Riedel got the impression that Caren was with friends a lot or out on the streets unsupervised doing what she wanted. Caren engaged in cutting behavior; Riedel thought Caren wanted people to see what kind of pain she was in. She pierced her belly button with a tack and pierced her skin at school with a stolen needle.[11] She told Riedel she wished her parents had done better and that she could go home and they could be a typical family.

At the time of trial, Caren was in Millwood Hospital; she had been expelled from school for fighting, and the teachers were concerned that Caren was using drugs at school. It was Caren's second hospitalization during foster care. Caren was "extremely academically delayed" because she had not gone to school regularly when she was with her parents and because she had had to move schools each time she moved to a new foster home.

At the time of trial, Caren was sixteen and failing the eighth grade. Riedel thought Caren could catch up, but she said Caren had a "who cares" attitude.

---

[11]A boy in school took the sewing needle in home economics class; Caren pierced her arm with it and tried to pierce the boy's. His parents were threatening to file assault charges at the time of trial.

18

According to Riedel, Caren truly believed she was stupid, which Riedel said was simply untrue. Caren had told Riedel that Mother did not finish the eighth grade.

### 3. Father

The State called Father to testify. He said that he had been homeless for about year and a half. He had been married to Mother for seventeen years but had not seen her for three months before trial.

Father had been the subject of a CPS referral for neglect when Caren was about three years old; the case was closed. He had also been the subject of a referral in Decatur for "[n]ot watching [the] children [Caren and Karmen]." That case was also closed. A third referral was made in Bowie after all five children had been born and Janice was about five. According to Father, "[N]othing really came out of it. It kind of lead into this case. [CPS] came over and visited a few times. No . . . services were really offered." There was a period of about one month when Mother could not be around the children. The main allegation of the third referral was that Mother did not watch the children while Father was at work. The referral was from Father's father.

The last referral was about a year later, in 2008. According to Father, he and Mother were homeless and called CPS themselves. They told CPS that they could no longer take care of their children and that they needed help.[12] The family was being evicted from the Sunset Inn, and Mother and Father were moving back to the lake.[13] CPS removed the children; according to Father, they

---

[12]Prior to the removal, Father's father had let Karla and Joan live with him while an aunt took Karmen and Caren, but only for a short period of time.

[13]Father and Mother called CPS because it was November, and they could not take the children to the lake in the wintertime; it would be too cold, there was

19

did not offer services except for a housing list, but the family was too large for any of the listed places. Father and Mother had tried to get family to take the children, but Father's father was too old, and "[t]here was some . . . fighting between [Father's] sisters over the other children." Father was working part-time, but Mother was not working.

Before the phone call to CPS, the entire family had once before lived at the lake on the LBJ Grasslands; after the removal, Father and Mother moved back there. Everyone, including all the children, slept in a tent and took baths in the lake. The family was getting food stamps during that time of about $800 a month. According to Father, neither he nor Mother could find a job because the economy was so bad. A CPS worker visited the family once at the lake, brought them a cooler, and told them they were in violation of the law.

Father testified that before living at the lake, the family had lived in Cooke County; the house they were living in burned down, which is how they ended up at the lake.

Father's car was often not working, and the bus did not stop by the area where they were living, so Father and Mother had to talk to the "people that ran the bus line" to get the children picked up for school. Father admitted that the children had problems with school attendance and had attended several schools. Father also admitted that some of the children had problems with school but others "did real well." Caren failed seventh grade twice, but Father was not sure why. Also, Joan failed one year, but Father did not know why. The other girls

_____

no water, and they could not bathe as they had in the summertime. Plus, the children had to go to school, and there was no bus service at the lake.

were in their appropriate grades. At least one of the schools had notified Father and Mother that the children were behind because of lack of attendance. Father tried to make sure the children made it to school more often. Mother was the primary caregiver, however, especially when Father was working.

Father had been arrested for domestic violence when he and Mother were living at the lake;[14] he slapped her, and she pulled his hair, scratched him, and slapped him. Father did not press charges against Mother, but he was convicted of assault family violence in 2009 on a plea of no contest, and he was still on probation at the time of trial. Although Father denied the allegations in the police report, it stated that Father pulled Mother out of the tent by the hair, straddled her, sat on top of her, and struck her five times in the head. Mother also alleged that Father had choked her for a few seconds.

According to Father, he had never used drugs. CPS gave him two drug tests, and only one was positive for painkillers. He had taken the painkillers for kidney surgery. At the time of the first CPS referral though, when Caren and Karmen were little, Father would drink about one six-pack of beer a weekend. He had used illegal drugs when he was a teenager but not since the children had been born. Father had either seen Mother use marijuana after the children were born or Mother had told him about the marijuana use. He denied that Caren had used drugs at home. He did miss a couple of drug tests, but he explained that he was just tired of taking so many drug tests that were always negative.

---

[14]Although it is somewhat unclear from the record, this incident appears to have occurred after the children were placed in foster care.

Father admitted taking the children to Walmart two times to eat chicken that they did not pay for; he admitted it was not right and said he was not trying to train the children to steal things. He was simply at the end of his rope and had nowhere else to turn. When it happened, the food banks and churches were closed for the evening, and Father's and Mother's fathers had "turned [them] down."

Father admitted that when the family was living in the tent, the girls did not get regular doctor's visits. He acknowledged that the girls had been negatively impacted by his inability to obtain a job or home.

According to Father, Mother did not have a history of mental illness, but in the last year before trial, he had seen her exhibit aggressive behavior and talk about things that made no sense. Her "thought patterns were all different." He did not see this behavior in Mother until the children were placed in foster care.

### C. Analysis

Caren reported to her therapist, and Caren and Karmen both reported to Milner, that both parents had used drugs and alcohol and that the girls had been locked in a room afterward. Father's negative drug tests do nothing to contradict this evidence, especially considering the evidence that he missed two tests and that he and Mother evaded Milner when she tried to visit them at their home in Cooke County.

Both Caren and Karmen reported domestic violence in the home. Although appellant's brief glosses over this aspect of the evidence, it is important. Caren and Karmen were both scared of their parents' fights, which at least on occasion, according to Caren, involved them throwing objects and hitting each other. Caren reported "a long history of violence" in the home, which

22

included Father pushing Mother out of the car at high speed. Although there is less evidence about the effect of this behavior on the three youngest girls than its effect on Caren and Karmen, that is likely attributable to Caren's and Karmen's being older and assuming protective roles toward their younger sisters.

Although CPS closed its case when the family was intermittently living in the Grasslands because the children appeared to have their basic needs being met, all of the children had been involved in stealing food on at least two occasions, and Caren and Karmen reported frequently going hungry. According to Milner, Mother and Father knew how and where to obtain services, such as food; thus, a fact finder could have reasonably formed a firm belief that the children sometimes went hungry because of Mother's and Father's drug habits.

Accordingly, we conclude and hold that a factfinder could reasonably form a firm conviction or belief that Father violated subsection (D) of section 161.001(1); therefore, the evidence is factually sufficient to prove this ground for termination. *See, e.g., In re C.J.O.*, 325 S.W.3d 261, 265–66 (Tex. App.—Eastland 2010, pet. denied).

### III. Best Interest

### A. Applicable Law

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008).

The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

23

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with
    (A) minimally adequate health and nutritional care;

    (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

    (C) guidance and supervision consistent with the child's safety;

    (D) a safe physical home environment;

    (E) protection from repeated exposure to violence even though the violence may not be directed at the child;  and

24

(F) an understanding of the child's needs and capabilities;  and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include

(A)    the desires of the child;

(B)    the emotional and physical needs of the child now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the best interest of the child;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)    any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive.  Some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.  *C.H.*, 89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child.  *Id.*  On the other hand, the

25

presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## B. Applicable Facts

## 1. The Girls' Needs

Dr. Doss supervised a visit with the girls and Father. Dr. Doss thought the visit went "exceptionally well" and that Father related well to each girl. Father was emotionally engaged with each one. The girls were glad to see him, hugged him, and were very responsive. Dr. Doss did not witness anything inappropriate and was impressed. Dr. Doss had talked to Father before the visit and asked him not to promise the girls anything because Dr. Doss was concerned that they had "been like a Yo-Yo." Father understood and complied. Dr. Doss saw the four younger girls again after the visit; Karmen did not say much other than "it was all right." The other three said the visit was good, but they were "kind of emotionally detached" about it.

Dr. Doss thought the girls needed to be placed somewhere where they would feel settled and permanent. Dr. Doss thought that to achieve this, Father's relationship with the girls should be terminated because he did not think they could "really connect with the stable place they are with if they have that dynamic where their father is still in - - kind of in a part-time or in that kind of a role." Dr. Doss would be concerned even if Father were able to eventually provide this type of stability because he would be having to work so much that the girls would essentially be raising themselves. Dr. Doss agreed that losing the relationship with Father would be damaging but that more damage could be done by the disappointment the girls would experience if they thought Father would be able to take care of them and then Father was not able to do so. In response to

26

questioning, the girls would tell Dr. Doss they wanted a relationship with Father, but "then they [wouldn't] talk more about it." They engaged with Father more than Dr. Doss.

In response to questioning from Father's counsel, Dr. Doss said that any reunification with Father would have to be on a gradual basis and that Father should have counseling focused on how to interact with children who have the same kinds of issues that the girls face. Dr. Doss characterized the girls as suffering from neglect. He said the girls often had a flat affect and that they were all "kind of disconnected." According to Dr. Doss, the girls needed to be settled "sooner rather than later." He reiterated that in his opinion, termination was the best option for the girls to obtain the stability and permanence they need. The girls were doing well with the foster family they were living with at trial, had decorated their rooms, and had expressed to Dr. Doss that they enjoyed living in the home.

The trial court asked Dr. Doss about the effect on the girls when their mother terminated her rights. Dr. Doss said their reaction was "[v]ery little." He did not think there was a goodbye visit and could not recall whether the girls even told him.

The youngest four girls were in their first foster home for four or five months. They had to move from their first foster home because the foster parents were getting a divorce. Their move had nothing to do with the children's behavior. The second foster parents refused the placement because Joan was exhibiting such defiant behaviors that it "was wearing the foster parents out." At the time of trial, the girls had been in a fourth foster home for almost three months.

Caren was in a foster home by herself because of her behavioral issues and because she initially requested not to be placed with the rest of her siblings. She got to see her sisters every other week for two hours. Caren was moved every two to three months because of "[h]er behavior and her cutting incidents . . . that would ultimately land her in the hospital." At the time of trial, she was on her third hospital stay and fourth foster home.

Patterson still believed that it was in the children's best interest for Father's rights to be terminated:

> These girls have lived in constant chaos, in constant fear with no permanency. They need permanency now, not six, seven, eight, nine months at the end of this program.

> We have no guarantees at this point that he is going to have employment and stability at the end of that time.

> We need to get these girls in an adopted home, where they can move on with their lives.

Patterson said there is a more limited pool of foster homes than adoptive homes; adoptive homes can be found nationwide. Patterson testified that the foster home the four youngest girls were currently living in was licensed for adoption as well, but the family was not sure they could take Caren because of her destructive behaviors. At the time of trial, the girls were able to visit with Caren once a month. Patterson said there would be more flexibility between adoptive parents for visitation options. If Caren could not be adopted, she would most likely be eligible for the PAL program, which would help her graduate and get her into a trade or vocational school if she could not get into college; if she got into college, she would have a full scholarship.

28

Dr. Polakoff testified that Caren needed a "very high-level structure" with "extremely high-level supervision due to her high-risk behaviors." Because Caren presented herself as cooperative and pleasant, a caregiver would need to be firm and be able to see beyond Caren's outward appearances. Dr. Polakoff would not recommend leaving Caren with younger, smaller children; in fact, she recommended twenty-four hour supervision.

Caren needed a placement "with lots of supervision and support [and] lots of appropriate nurturance and encouragement, as well as . . . consequences of her behavior." Caren needed someone who could reinforce good behavior and help guard against bad decision making. Riedel thought Caren would not improve until she established some permanence. Her current foster parents were committed to taking Caren back after she was released from Millwood. However, Riedel did not know whether they would adopt Caren; she thought they were questioning their ability to help Caren because of all the trouble they had had with her.

Caren loved her parents and wanted to be with them, but she did not think it would work out and worried about being placed in foster care again. She missed being with her sisters, and Riedel thought she needed regular visits with them. Because of Caren's difficulties, she needed to be with a committed family, like her foster family, who was in "intensive psychological therapy." She said it would be important for Caren to know that Father loved her and was working hard to change, even if Caren was adopted by someone else. Riedel said that if she had a guarantee Father could provide adequate care and supervision, role modeling, nurturing, and educational support, Caren would not be harmed by waiting a few months to be with him. But without any certainty, she was worried

29

about the level of Caren's anxiety from the waiting. Riedel said Caren would need a parent who was involved at school, helped with anger management, and was extremely observant to deal with the cutting behaviors. The parent would need to have skills beyond what CPS typically sees in cases in which it is involved. She opined that someone who could not complete a service plan could not take care of Caren.

When asked by the court how Caren would feel if the judge gave Father a second chance and he messed up, Riedel said, "I don't think it would surprise her that much. I think that's what she expects. She expects the worst to happen in every situation at this point." Riedel felt that Caren would try to reconnect with her parents when she was old enough; she said all her teenagers are aware of that possibility.

The children's CASA advocate testified that termination was in the children's best interest.

## 2. Father's Situation and Parenting Abilities

When Patterson first met with Mother and Father at her office, she presented them with a service plan. At that time, she had fairly consistent contact with Father and Mother. She assisted them in setting up some of the services. Mother was not compliant with the drug testing and tested positive for marijuana on two of the tests she took. Father missed two or three tests. Mother and Father were discharged from family therapy for failure to show up to appointments; Mother went five times, but Father went to only two. Mother did not go to individual counseling, but Father went to eight of ten sessions.[15] Prior

---

[15]According to Father, he stopped going to counseling because he wanted to transfer to MHMR counseling closer to where he was living with his father;

30

to trial, however, Father called Patterson and said he wanted to start therapy again; he started two weeks before trial. Father was consistent in visiting the girls.

The Department changed its plan to adoption because it appeared none of the children could be returned to Father or Mother, and there was no potential family placement. Father's father had passed away, and his one sister lived in California and could not take the children. At one point, the Department had been looking to place the children back with Father only; Father was working at least part of his service plan and had a part-time job that he thought would lead to a full-time job.[16] But he lost that job, and the disability he thought he would be getting did not come; at that point, which was in September 2009, Father stopped communicating with CPS.

Father still said he wanted the girls back. The only time he talked about relinquishment was in late December 2009 and January 2010 after Mother signed her affidavit of relinquishment; Father's father had just died and charges were pending against Father for the violence against Mother. He stated positively that he wanted to relinquish his rights at the memorial service for his father; Patterson discouraged him from doing so at that time. Father told the three youngest girls and then Caren and Karmen together that he had decided to

_____

MHMR was slow about getting him into their program, and when they finally did, his father had died, and Father was busy handling arrangements.

[16]Patterson said that even though some of the services were not located in Bowie or Decatur when Father was living there, she offered to transport him anywhere he needed to go on twenty-four hours' notice.

31

relinquish his rights; he did not see them again until April 2010 when he had decided he did not want to relinquish his rights.

At the time of trial, Father was working in a program run by U-Turn Ministries, cooking, driving, doing construction work, mowing, working in the food pantry, and feeding the homeless. He was not yet earning money but anticipated that he would be in about a month after the trial. He was not sure how much he would be paid. The program would be for eight months to one year, depending on the individual, and Father had started the program in January 2008 about four months before trial. He was referred to the program by the probation department, but he was participating in it voluntarily.

Father knew that he could not have his children back at the time of trial, but he asked "for some time." If the trial judge were willing to do that, he would get a job and "take care of [his] children the way [he] should." According to Father, he would be allowed to get a job in a couple of weeks after trial. The ministry had helped him deal with depression and guilt that had kept him from fulfilling his service plan requirements. He said that he would be better about contacting his caseworker and "comply in every way possible for my family." According to Father, the ministry would be his support system, would provide transportation if necessary, and would "help in every way possible."

Father planned to continue working for the ministry even after he was released from the program. The ministry supported several businesses; Father wanted to start his own new business through the ministry. He thought he could make between $2,000 to $4,000 a month. He also planned to continue to live there until at least four months after the trial; there were eleven to thirteen men living there, but Father did not have his own room or his own house. He agreed

the arrangement would not be suitable for the girls; all of the men in the program were on probation. Father's long-term goal was to get his own house somewhere in the Bowie or Crafton area, depending on what kind of money he would be making. He did not know how much he would make, "but it would be sufficient to care for the girls." Father could not guarantee that in four months he would have a job or how much he would be making. His backup plan if the ministry would not or could not help was to find a daycare that would accept the children for long periods of time during the day.

Father talked to Mother before she relinquished her rights. She told him she was not mentally stable enough and could not deal with any more than what they had already gone through. Father was surprised though; he thought Mother would want the children back and work her plan.

Father said he was prepared for the responsibility of parenting all five girls without the support of his wife. Father agreed that the children needed permanence and stability. He testified that he had a bond with the girls and they needed to be with him. Also, if they were with him, all five could be together; at the time of trial, Caren and Karmen were not living with the younger three according to Father. Father knew he needed to be more observant with the teenagers and be more of a boss. He was willing to do "whatever it takes." He felt he was better able to do so at the time of trial because he had a better support system and was more capable mentally. However, Father admitted that he did not know for sure where he would get a job and had no concrete plans.

Father was concerned about the children being in CPS's care because Caren had been in a mental institution for four months. He was not sure how that had impacted her. He understood that she did have mental health issues, and

33

he was prepared to get her "counsel[ing], medication[,] whatever it takes." He felt that being in foster care was negative for Caren because she had tried to jump out of a window and broke one of her ankles, and her behavior issues had been compounded. He felt that through his work at the ministry he had developed the tools as a father to help her and that it would be positive for her to be back with him and her sisters. He also thought being away from Caren had impacted Karmen negatively.

Father believed that Karla had some educational issues that needed to be addressed, but he was not sure what they were. She was very close to Caren and very much like her. Father was willing to work with CPS and the school system about Karla's educational needs. He wanted all the girls to go to college and was willing to "put in the time" with them necessary to make that happen. Father testified that he worked sixteen to eighteen hours a day at the ministry, cooking for others and driving them. He felt he had learned how to be attentive to the needs of others. He was ready to discipline the girls as necessary, which he understood to mean age-appropriate grounding, time outs, and taking away privileges. He acknowledged making mistakes in the past by being a passive parent.

Father attended regular visits with his children. He told them at one of the visits—for their grandfather's memorial service—that he was going to relinquish his parental rights. He told one of the girls to get on with her life, go to college, not to try to look up him or Mother, and excel in life. According to Father, he told the girls he did not have a choice because he was "probably headed to jail." At the time, Father was behind on paying his probation fees; he had been told "it didn't look good" for him. He felt as if he had no other option. But the day after

34

the visit, another person in the probation office told Father that they were not prepared to arrest him and had not issued a warrant for his arrest.

Kevin Alexander, the pastor and director of U-Turn Ministries, testified that he first became acquainted with Father in January 2010. He met Father at the probation department and decided he was a good candidate for the program, which Father volunteered to join.

Alexander described the program: for the first ninety days, the ministry would teach participants the word of God, how to work, and how to submit to supervisory authority. After someone had been with the ministry awhile, the ministry staff taught him how to do job interviews, how to handle conflict in the workplace, and how to deal effectively with difficult situations instead of turning to alcohol, drugs, or giving up hope. Attendees were not free to come and go at the beginning of the program because people who have problems with alcohol and drugs can fall back into using them too easily. Attendees had to abide by strict rules; their day began at 5:30 a.m. and ended at 10:30 p.m. The men spent the morning doing devotions and Bible study, the afternoons working at area churches, and the evenings in Bible study. The ministry participants did community work, such as working with food banks. Staff encouraged the attendees not to associate with people or friends that could lead them into bad behavior. Staff tried to work around individual circumstances such as parole, probation, or CPS involvement; in other words, if someone had to make extra phone calls or had appointments, they tried to work around that. They did whatever they needed to do to help the men succeed. The men earned extra work privileges as they moved through the program.

35

Father was doing "great" in the program; he had given up hope when he arrived, but he had started changing and was getting involved more. As Alexander described, "He's going somewhere. He's got a vision. He's got a purpose. He's got a plan, and he's headed somewhere."

Alexander said that some come into the program and try to manipulate the system; the program makes adjustments for those types of situations. Alexander did not think Father was one of those men.

As for the future, Alexander said that after six or nine months in the program, the men would start working in one of the ministry's business groups, either landscaping or in a scrap business or another business. The men would be able to earn money; in the last three to six months of the program, they would be helped in finding a full-time job. Some would stay with the ministry and work there; the ministry taught the men to save their money and helped them get an apartment and eventually into full-time housing. Alexander said the ministry asked for at least a year's involvement, but some chose to stay longer. Alexander estimated that it would be another six months from the date of trial (end of October 2010) before Father would be able to look for a full-time job. He thought Father had the skill and ability to find a full-time job. As an example, he said Father was very skilled at organizing and overseeing the inventory for the food pantry.

Alexander told the court that when Father started looking for full-time work, the ministry would help him with getting housing, doing what he needed to be able to do to take care of the kids, and making a budget plan. He also said the ministry would help Father with visiting the kids and attending meetings required by any service plan that the trial court might order instead of termination. The

ministry would also help him complete his probation requirements. Alexander believed that Father genuinely cared about the children. Alexander said they did not have anything in place at that time to help out with getting the girls back, but that he had people willing to help out. According to Alexander, "[t]he service will continue when he gets his kids, just like it did before he got his kids." Alexander said the ministry would continue to support Father even after he was finished with his year commitment and help him learn to be a good parent. Alexander said Father was committed to the girls, and the court had more reason to trust Father now than it did before.

Alexander testified that if Father did not find a job until the next January, the ministry would still pay him for his part-time work, feed him, clothe him, and house him. When someone was ready to live on his own, the ministry would help find him housing. At the time of trial, there were eight to ten men living in the ministry's home; not all of them were on probation. Most of them had been involved with drugs or alcohol, or they were homeless. Father told Alexander that he had had a problem with alcohol. U-Turn did not provide AA or NA meetings or psychological counseling; all of the curriculum was based on Bible study. Alexander did not learn about the domestic violence until he came to court about a month before trial although Father may have mentioned needing to go to a meeting related to his probation.

Father's probation officer testified that he had not been paying fees while he was in U-Turn Ministries, nor had he been taking his required batterer's classes. However, the probation department would not revoke him while he was participating in U-Turn. He would have to make up those fees and take his classes once he had completed the program. Father had been reporting every

37

month and was "doing good."  The probation department director testified that even if Father was revoked, the maximum sentence that could be assessed was 365 days.

## C. Analysis

All of the girls' counselors testified that their need for stability and permanency was immediate and paramount.  Caren, especially, needed someone with advanced parenting skills and an adequate amount of time to supervise her and be involved with her schooling and treatment.  At the time of trial, Father was not even able to start looking for work or stable housing for at least a few months, and he had not worked his service plan.  Although there was evidence that he had made positive personal changes in his life by the time of trial and was willing to begin working a plan again, there was no evidence of any changed or enhanced parental capabilities such as would be required to care for five children on his own,[17] one of whom would require one-on-one attention and who, according to one of the counselors, was not supposed to be unsupervised around her sisters.

Father did not have any support system other than the ministry to help him care for the children, and although Alexander promised to help Father with the girls in the future, there were no concrete plans for their care.  CPS had a long history with the family, and there appeared to be a long pattern of neglect based on drug and alcohol usage by Father and Mother.  Caren and Karmen were afraid to go back to their parents before their removal, and the girls were

---

[17]Father testified that he was going to divorce Mother after he was finished with the ministry's program even though one of the ministry's goals was family and marital reconciliation.

38

ambivalent about being returned to their parents in the future. Even considering that the girls had been in several foster homes in a short time, the evidence shows their best chance for the stability and permanency they needed was through termination and adoption (or the PAL program for Caren) rather than waiting for up to a year for Father to finish working the ministry's program. Although we are not unsympathetic to the positive changes made by Father before trial, our paramount concern is what the evidence shows is best for the children. Accordingly, we conclude and hold that a factfinder could reasonably form a firm conviction or belief that termination was in the best interest of all five children and that the evidence is thus factually sufficient in that regard.

## IV. Conclusion

We overrule Father's sole issue, and we affirm the trial court's judgment.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL: LIVINGSTON, C.J.; MCCOY and GABRIEL, JJ.

DELIVERED: June 23, 2011

39